D9UFMOR1                        Trial

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                          12 CR 223 (VM)

 5    JOHNNY MORGAN,

 6              Defendant.

 7    ------------------------------x
                                         New York, N.Y.
 8                                       September 30, 2013
                                         9:30 a.m.
 9
      Before:
10
                        HON. VICTOR MARRERO,
11
                                         District Judge
12
                            APPEARANCES
13
      PREET BHARARA
14         United States Attorney for the
           Southern District of New York
15    AMY GARZON
      JOAN M. LOUGHNANE
16         Assistant United States Attorney

17    SEWARD & KISSEL LLP
           Attorneys for Defendant
18    RITA M GLAVIN, ESQ.
      DAVID DRISCOLL, ESQ.
19    MICHAEL WEITMAN, ESQ.
      BRIAN MALONEY, ESQ.
20    MICHAEL BROZ, ESQ.

21    Also present:

22    Jama Joseph, NYPD
      Danielle Craig, paralegal
23    Katy Rogers, Paralegal

24

25
```

1              (Case called)

2              (In open court)

3              THE COURT:  Good morning.  This is a proceeding in the

4   matter of United States v. Johnny Morgan, docket number 12 CR

5   223 and it's scheduled as the commencement of the defendant's

6   trial on the government's charges against him in this matter.

7   There are a number of housekeeping and preliminary issues that

8   need to be addressed before we proceed to call in a jury pool.

9              First, the government had submitted motions in limine

10  with respect to testimony from some of its witnesses that the

11  government sought to limit cross-examination about.  The

12  defense submitted a memorandum in response to the government's

13  motion which the Court has reviewed.  I want to address whether

14  the government has any further response or replies to the

15  defense opposition to the motions in limine.

16             Over the weekend the Court also received two

17  submissions from the defense.  One is a request to postpone the

18  trial in order to allow for the Court to schedule a Daubert

19  hearing with respect to the government's DNA evidence in this

20  case that rests on what the defense contends is questionable

21  basis for insufficient backup.  Second, the defense asks for

22  preclusion of the government's DNA report on the grounds that

23  the government's witness, who will testify about the DNA tests

24  taken at the medical examiner's office, was not the person who

25  conducted the actual test but someone who reviewed the tests a

1    couple of weeks after they had been conducted, that is, the

2    particular tests at issue here.

3         Let me first ask the government whether it received

4    and reviewed the two submissions from defense counsel that I

5    just described and also the response to the motions in limine.

6         MS. GARZON:  Yes, your Honor.  Good morning.  I guess

7    I'll start with -- yes, we did receive defense counsel's

8    submissions over the weekend.  And I can start with those

9    submissions if your Honor prefers.

10        THE COURT:  All right, why don't we do that since

11   there's a request to postpone the trial.

12        MS. GARZON:  As the government explained to the

13   defense this weekend upon obtaining that information the

14   government would object to a postponement of the trial but I'd

15   like to provide some background to your Honor as to why this is

16   the government's position.  The defendant here had this report

17   that's now become in issue since June of 2012.  That report

18   reflected the type of testing that was conducted in this case.

19   The government then provided the same report to the new defense

20   counsel in this case on September 4.  It again provided that

21   report to defense counsel on September 9 when it made its

22   expert notice.

23        The government also requested that the defendant

24   provide reciprocal notice of any expert that they intended to

25   recall.  The government did not receive any notice until on or

 1  about September 26 of an expert that they would intend to call

 2  in this case.  The name provided was Dr. Eli Shapiro.  We had

 3  not obtained any information about Dr. Shapiro including any

 4  summary of the opinion that he was expected to give at trial.

 5  So over the weekend the government really learned for the first

 6  time first, that the defense was going to call another expert

 7  witness, I think his name is Mr. Eric Carita.  It also did not

 8  get any background or documents for Mr. Carita.

 9          The government's position is that the defendant has

10  had this information all along.  Any Daubert motions could have

11  been made way in advance of this trial.  It wasn't necessary to

12  wait until the eve of trial to make these kinds of motions.

13  Nonetheless, the government, if your Honor is inclined to grant

14  the adjournment, would consider foregoing the DNA evidence so

15  that trial can continue as scheduled.

16          THE COURT:  All right.  Let me just, not to invite any

17  debate on this thing.  The Court is not inclined to postpone

18  this trial.  It's been on the Court's docket for a long, long

19  time.  I agree with the government that the defense has had

20  this DNA report long enough for it to have reviewed it and

21  responded to it appropriately through its own expert if it

22  wished to do so.

23          Ms. Glavin, you perhaps can address the government's

24  observation that defense provided a name of one expert and then

25  over the weekend switched to another without providing any form

1      of information about who the person is, anything that would

2      enable the government to do whatever form of background check

3      of the expert's eligibility to testify at this proceeding.

4              MS. GLAVIN:  Your Honor, with respect to the first

5      point about the defense having the report.  The report nowhere

6      says, the report that the defense was provided apparently since

7      June of last year, certainly before I became involved in the

8      case, as you know, the report nowhere states that the DNA

9      testing done in this case was low copy network testing.

10     Nowhere.  So the defense had no idea that this new technology

11     had been used in the second set of testing.  There is nothing

12     in the report that would have indicated that.  And in fact the

13     report that the government provided to us said that the testing

14     was, it indicated the same sort of type, STR testing.  LCN

15     testing is a subset of that, that has been the form of the

16     controversial testing that is now the subject of at least as I

17     understand it three different Frye hearings right now in the

18     various boroughs of Manhattan.  So the defense was not put on

19     notice that low copy network testing was at issue in this case

20     and we did not find out that that was low copy network testing,

21     because we had no intent to challenge the admissibility of

22     these DNA reports until on Thursday afternoon we met with the

23     government's expert at the office of the County Medical

24     Examiner and it was only during the course of our meeting with

25     that individual that we learned for the first time that this

1      testing involved was the low copy testing that has been the

2      subject of some challenges.

3              The next day we were hoping that we would have called

4      Dr. Eli Shapiro.  The next day on Friday we talked to our DNA

5      consultant about this and about low copy testing, his name is

6      Eric Carita and he laid out for us the issues with respect to

7      that.  It was only at that point -- and I want your Honor to

8      understand a couple of other things, too.  We reached out

9      because of my concern about that form of testing because we did

10     legal research over the weekend.  We reached out to the Federal

11     Defenders to get a sense from them about whether, what this LCN

12     testing was and if it had been challenged before.  My

13     understanding from communications with David Patton is that

14     this hasn't been challenged here before but it is the subject

15     right now of Frye hearings throughout the city and no appellate

16     court has ruled on it.

17             When we made that motion for an adjournment I can

18     assure you that I was not happy about it.  Because we wanted to

19     go to trial on Monday.  But to have any type of meaningful

20     cross of the government's expert about that unique form of

21     testing I am going to need an expert familiar with that unique

22     form of testing, not just your regular DNA expert.  And that is

23     my grave concern, because I do not believe I can effectively

24     cross-examine the defense expert about low copy testing unless

25     I have an expert sitting next to me who can point me to the

1    main issue with the low copy network testing is its

2    non-reproducibility and its stochastic effects.  So that is why

3    we asked for the adjournment.

4          I was reluctant because I know my client wanted to

5    have a trial today.  I spoke to him at length about this issue

6    because he did not know this was low copy network testing that

7    had been involved the second time in this case.  And it is his

8    view that he wants us to raise the issue and to challenge it

9    and I don't think there's any more critical challenge that the

10   defense can make in the case and, frankly, I think it would be

11   ineffective assistance if we did not make this motion.

12         The defense has not been on notice since June 2012

13   that this was low copy network testing.  We knew it was a DNA

14   test done and my understanding is it was done pursuant to the

15   standard DNA procedures and not LCN testing.  That is why we

16   need an adjournment to discuss the issue, your Honor.  There's

17   only one federal court in the United States that has opined on

18   the reliability of LCN testing.  So that's the first issue.

19         The second issue --

20         THE COURT:  Before you move to the second issue, the

21   government indicated that it would be prepared to proceed

22   without the DNA evidence rather than adjournment.

23         MS. GLAVIN:  Yes, your Honor.  If the DNA were out of

24   the case entirely we're ready to go forward today.

25         MS. GARZON:  Your Honor, if I may just speak on that

D9UFMOR1                         Trial

1    issue briefly.  Given that this Daubert challenge was brought

2    on the eve of hearing I just want to state a couple of things

3    here.  Although defense counsel, she has acknowledged there's a

4    second report here, that second report while it does not say

5    low copy it does say it is a different test and that is a high

6    sensitivity PCR test.  So I just want to put that on the record

7    and that is low copy DNA testing.  Any expert had they been

8    provided that report in 2012 could have informed the defense of

9    that.

10           But to address the second issue of whether we'd forego

11   the DNA evidence, I just want the record to be clear that it is

12   a substantial piece of evidence that the government would be

13   foregoing, so in that respect the government would ask that if

14   it does forego the DNA evidence no reference be made to the DNA

15   evidence in this trial either by the government or for the

16   defense.

17           THE COURT:  Ms. Glavin?

18           MS. GLAVIN:  Your Honor, the report does not even say

19   it was high sensitivity testing and there are different types

20   of high sensitivity testing of which LCN is one and this does

21   not say LCN.  It says high sensitivity PCR DNA testing.  PCR is

22   the standard DNA test.  Low copy network is what is in all of

23   the literature, your Honor.  Low copy network is what has been

24   referred to in Judge Gleeson's opinion and in the District of

25   New Mexico, and low copy network is a very unique form of this

1   high sensitive testing.  If we weren't dealing with low copy

2   network and we were dealing with your standard testing we would

3   be going forward today without question.

4            THE COURT:  The government proposes that if it

5   proceeds to the trial without the DNA tests that no reference

6   be made by either the government or the defense.

7            MS. GLAVIN:  Your Honor, we agree with that with one

8   exception.  We are entitled in closing to raise what evidence

9   there is and what evidence there is not in this case.

10           MS. GARZON:  Your Honor, the government would not

11   agree to that.  That would be misleading.  There is DNA

12   evidence in this case.  The government is willingly foregoing

13   it so this trial can proceed despite having given ample notice

14   to the defendant of the type of testing done in this case so

15   the government would oppose any such reference throughout the

16   trial or in summation.

17           THE COURT:  Ms. Glavin, when you mention what evidence

18   there is not, if you at that point say you've heard the

19   evidence the government has proposed and now let me tell you

20   the evidence that there is, where is the DNA evidence --

21           MS. GLAVIN:  Right.

22           THE COURT:  I think that's asking, essentially, you

23   want the cake and eat it too.

24           MS. GLAVIN:  No, your Honor.  Because the jury is

25   going to hear there was no fingerprint evidence done, they're

D9UFMOR1                    Trial

1    going to hear there was no gunshot residue tests done, and if

2    there is no evidence, period, offered in this, it is a fair

3    comment on the evidence that has been introduced in the four

4    corners of this courtroom.

5            THE COURT:  Is there fingerprint evidence?

6            MS. GLAVIN:  No.

7            THE COURT:  There is DNA evidence.

8            MS. GLAVIN:  There is DNA evidence, but what the

9    government is saying is they are not --

10           THE COURT:  Again, you can't have the cake and eat it

11   too.  Either you want the evidence or you don't want it.  If

12   you agree not to have it then you can't say where is the DNA

13   evidence because you know it exists.  In that case we'll just

14   postpone the trial and the DNA evidence will come in.

15           MS. GLAVIN:  Let me -- well, the DNA evidence would

16   come in, your Honor.  I would assume that you haven't prejudged

17   whether it would come in if we have an expert and we discuss

18   this specific --

19           THE COURT:  I understand there is a more likelihood it

20   will come in then than there is now.

21           MS. GLAVIN:  Let me have a moment to discuss this with

22   Mr. Morgan.

23           THE COURT:  Yes.

24           (Pause)

25           MS. GLAVIN:  Your Honor, we'll go forward today.

1          THE COURT:  Next issue.  Ms. Glavin, you had a second

2     issue or second matter you wanted to address.

3          MS. GLAVIN:  Oh, your Honor, I don't think we need to

4     get into it.  It was with respect to the experts.

5          THE COURT:  All right.  Yes?

6          MS. GARZON:   Your Honor, I'd just like to clarify,

7     then, that there will be no reference, either through the

8     questioning of witnesses, in the opening, the summation to DNA

9     evidence.

10          THE COURT:  That's my understanding.

11          MS. GARZON:  Then I guess the next item on the agenda,

12     your Honor, is the government's motion in limine.  I don't know

13     how much detail your Honor would like me to get into.

14          THE COURT:  Well, if you have the defendant's

15     response.

16          MS. GARZON:  Yes.  I mean, there's not much more to

17     add.  The government's position is that the lay witnesses' old

18     convictions and/or arrests are not the proper subject of

19     cross-examination here.  Their prior convictions and arrests

20     are either close to or over ten years old and they just do not

21     bear on the witness' credibility and for that reason it should

22     not be --

23          THE COURT:  All right, let's take them one at a time.

24     The defense highlights one witness's arrest for theft of an

25     auto or what they claim to be theft of an auto for 30 minutes

1    and they allege that theft of an auto could certainly be

2    something that bears on truthfulness and probating.

3           MS. GARZON:  But, your Honor, I do believe that

4    conviction is over ten years old so it's precluded by the very

5    terms of Rule 603.  I mean 609, your Honor.

6           THE COURT:  And what about the drug convictions and

7    arrests that are pending?

8           MS. GARZON:  Again, your Honor, arrests are just

9    simply not included within the rule.  The rule contemplates

10   convictions only.

11          THE COURT:  Understood.

12          MS. GARZON:  So the arrests should totally be out.  As

13   far as the drug conviction, there's no -- aside from being old,

14   although they're not ten years old, they're certainly nine to

15   eight years old, so they are old convictions, and they just do

16   not bear on the witness's credibility here.  I think in each

17   instance for each witness actually they accepted responsibility

18   for what they had done and they pleaded guilty.  There's no

19   question that they took responsibility for what they did.  The

20   crime itself inherently does not require the proof of any act

21   of falsehood or dishonesty, so it's just simply not within Rule

22   609.

23          THE COURT:  Okay.  What about the 911 witness?

24          MS. GARZON:  Yes, your Honor.

25          THE COURT:  The issue there is whether or not that

1   witness is available and if the witness is available why did

2   not the government produce the witness.

3           MS. GARZON:  I think although that's the way the

4   defense has presented it I think the rule makes clear it

5   doesn't matter whether the witness is available or not.  It

6   falls right into one of the hearsay exceptions, here either

7   present tense impression or excited utterance.  If your Honor

8   has had an opportunity to listen to the call, the person on the

9   call, the 911 caller is telling the operator what's happening

10  as it's happening.  It's responding to the operator in terms of

11  where is this person --

12          THE COURT:  Let me stop you, Ms. Garzon.  The question

13  is whether or not the government intends to bring in the

14  witness.

15          MS. GARZON:  We would like to, your Honor.  We're just

16  not sure that is going to happen.  And if I may elaborate on

17  that, your Honor, we're just not sure he is going to appear.

18  The witness here was a victim of a violent crime a couple of

19  years ago, more like three years ago and he's still very

20  reluctant and very worried for his and his family's safety so

21  the government just has no assurance that he would appear in

22  court.  He is under subpoena.

23          THE COURT:  Just make a decision now one way or the

24  other and that way you can dispose of the question.

25          MS. GARZON:  We did have a conversation with him late

1    last week.  All indication is that he's not going to appear.

2    We'll keep trying, but we'd like to get a ruling from your

3    Honor so we know whether we can proceed with the 911 call so at

4    least we can start with that.

5              THE COURT:  My ruling is this is an excited utterance

6    and with regard to the 911 call it's admissible.

7              MS. GLAVIN:  Your Honor, with respect to that, there

8    were several calls to 911 that night between Mr. Santa is the

9    witness and the 911 operator.  There were at least two,

10   possibly three.  What the government wants to do is just

11   introduce the first call that night.  Under Rule 806 we intend,

12   then, to call Mr. Santa because we -- if they are offering an

13   out-of-court statement under the hearsay exception if the

14   declarant is not testifying at trial we have the right under

15   Rule 806 to impeach that declarant's statement.  If Mr. Santa

16   doesn't testify we would have to call him and cross-examine him

17   because there is impeachment evidence about his description of

18   the person in the subsequent calls who he says he saw that we

19   think is material to the defense case and goes directly to the

20   reliability of his excited utterance on the 911 call.

21             In addition, as set forth in the defendant's papers,

22   the government points out that Mr. Santa was the victim of a

23   violent crime of 2010.  What happened in 2010 based on the 3500

24   material that we received from the government, Mr. Santa is,

25   he's a 23 or 24-year-old man.  In 2010 he was stabbed.  He did

1    not -- and he went to the hospital.  Mr. Santa didn't report

2    that he was stabbed to the police until approximately two weeks

3    after it happened and when he went to the police he identified

4    the person who stabbed him as a man who lived across the street

5    from him and that he would see approximately 15 to 20 times a

6    week.  Based on that, the Bronx District Attorney's office

7    believed him and arrested that man.  Approximately eight months

8    later Mr. Santa called back the District Attorney's office and

9    told them I think I saw the man that stabbed me and it's

10   somebody else so please release the man I initially identified

11   who lives across the street and I see 15 to 20 times a week and

12   arrest this new man.  And the Bronx District Attorney's office

13   then began to question his reliability and what he had

14   initially told them and his response was all black people look

15   alike.  The Bronx District Attorney's office had to dismiss the

16   case.

17         So Mr. Santa's credibility with respect to that first

18   911 call is going to be critical at this trial for the

19   description that he gives the police, especially if it's coming

20   in under a hearsay exception.  The one or two subsequent calls

21   he has within 20 minutes after his first 911 call with the 911

22   operator are also going to be important as to credibility.

23   That is why we think the excited utterance, your Honor, while

24   it can come in we think will be misleading to the jury without

25   being able to bring in all this impeachment evidence about who

1    the 911 caller is and his ability to identify.

2             THE COURT:  All right, Ms. Garzon, address the Rule

3    806 issue.

4             MS. GARZON:  Yes, your Honor, and I believe that

5    brings us to defense counsel's motion on whether or not they

6    should be able to cross-examine Mr. Santa's statement that all

7    black people look the same.  First if I may provide more detail

8    that was left out by defense counsel's recitation.  Mr. Santa

9    was not stabbed.  He was slashed in the neck by a known person

10   in the neighborhood.  That slashing required 17 stitches.  As

11   your Honor may imagine that was a difficult situation for him

12   and continues to be.  He did to his credit in that case when he

13   realized he had ID'd the wrong person go back to the ADA and

14   say I misidentified the person, you should release that person

15   from jail.  As reflected in the government's 3500 he did not

16   feel it was appropriate to have someone in jail who did not

17   commit a crime.  So whatever mistake Mr. Santa made after

18   having been the victim of a slashing, he went ahead and

19   corrected it.

20             Now, whether he ID'd a victim in that case is not

21   relevant to his testimony here.  We didn't expect he would ID

22   the defendant.  In fact, he was shown a photo array by the

23   detectives in this case and he could not ID the defendant.  If

24   he did appear and the government was to call him as a witness

25   we don't expect he would be able to ID the defendant in this

1   case.  What he says in the 911 call is simply there's a man in

2   the street with a gun.  When the operator asked him where is

3   the man he states the location where the man is.  The operator

4   then asks him what is he wearing and he says a black shirt -- a

5   black jacket and a white T-shirt.  Again, the identity of the

6   defendant here is just not something within the realm of which

7   Mr. Santa can testify.  Therefore, what Mr. Santa did three

8   years ago in a case where he admittedly mistakenly identified

9   somebody is just simply not relevant to identification here

10  because there is no identification.

11            THE COURT:  Ms. Glavin?

12            MS. GLAVIN:  Your Honor, we're not going to contest

13  that Mr. Santa can't identify the defendant but what is

14  critically important is that Mr. Santa says I see a man with a

15  black leather jacket, a black man, and he has a gun.  A

16  critical part of our case is that Mr. Morgan did not have a gun

17  and Mr. Santa didn't see him having a gun that night and

18  therefore Mr. Santa's ability to perceive and see what is going

19  on at 4:00 in the morning that he's looking out a window into

20  the dark is going to be critical.  The fact that Mr. Santa

21  previously identified someone as an attacker who he knew and

22  saw 15 to 20 times a week is directly critical and relevant as

23  to whether or not he could have accurately perceived what he

24  saw at that particular time at 4:30 or 5:00 in the morning on

25  that evening.  But, so that's the first part.

1          The second part, your Honor, is in the two subsequent

2     calls that Mr. Santa has with the 911 operator, he provides

3     that 911 operator with additional information.  He tells the

4     911 operator that he believes the man that he saw has a or

5     drives a Honda Odyssey and that he's headed towards Barclay

6     Avenue.  There will be testimony in this trial that Mr. Morgan

7     doesn't have a Honda Odyssey or anything that even looks like

8     that.  So what he perceived is going to be critical and the

9     jury should be able to hear, if they offer that 911 call as a

10    hearsay exception they need to understand the whole context of

11    the series of conversations with the 911 operator and his

12    history of not being able to perceive someone correctly.  I

13    wouldn't be making this argument in respect to his attack in

14    2010 when he was a victim if Mr. Santa just randomly identified

15    somebody out of a lineup but it was the fact that Mr. Santa at

16    that time identified somebody he knew and said he saw 15 to 20

17    times a week as his attacker and then changed his mind.

18              THE COURT:  All right.  Thank you.

19              MS. GARZON:  Your Honor, I'm failing to see how

20    identifying a person bears on whether that same person can

21    perceive a gun.  I think the defense's argument really is about

22    the circumstances under which Mr. Santa saw the gun.  I don't

23    think it has anything whatever to do with whether it was this

24    defendant and whether one can see a person and identify that

25    person is just simply very different as to whether one can see

D9UFMOR1                    Trial

1   a gun.  You can't misidentify a gun.  It's either a gun or it's

2   not a gun.

3           THE COURT:  All right, thank you.  I will rule that if

4   the excited utterance comes in under 806 the defense can bring

5   in Mr. Santa and cross-examine him on anything that may pertain

6   to his reliability, the witness's ability to identify what he

7   said he saw in the 911 call and any possible reason for bias,

8   for example, to the extent that any bias he may have against

9   any particular ethnic or racial group might have affected his

10  perceptions or his motives.  I think those are all relevant

11  considerations.

12          MS. GLAVIN:  Your Honor, with respect to that, I just

13  ask, I know Mr. Santa is under subpoena, so I would ask that

14  the government inform Mr. Santa that he remain under federal

15  trial subpoena to appear in court.

16          THE COURT:  All right.

17          MS. GARZON:  Yes, your Honor.  We've served the

18  subpoena and we've explained to him what it means multiple

19  times.

20          THE COURT:  All right.  Is there anything else from

21  the government, anything else outstanding?

22          MS. GARZON:  Your Honor, I don't believe we've gotten

23  any rulings on the other prior convictions and arrests of the

24  other lay witnesses.

25          THE COURT:  The other prior convictions and arrests,

1    insofar as any of them are over ten years old, the Court rules

2    that they would not be admissible.  To the extent that the

3    arrests are for drug offenses, the Court is not persuaded that

4    they bear on the witness's credibility so I will exclude

5    cross-examination on those grounds on those matters.

6             MS. GARZON:  Yes, and then I just believe there's the

7    one piece for prior drug use.

8             THE COURT:  That's the witness who is currently under

9    prosecution for drug use?

10            MS. GARZON:  I don't believe he's currently under

11   prosecution.  He was arrested for --

12            THE COURT:  He has a pending case.

13            MS. GARZON:  Yes, I forget the term for it, if I may.

14   It's adjourned in contemplation of dismissal which basically

15   means if he behaves himself for the next few months it goes

16   away, it's dismissed.

17            THE COURT:  All right, I will preclude that

18   cross-examination on the same basis that it does not bear on

19   questions of credibility on serious crime.

20            MS. GLAVIN:  Your Honor, with respect to whether or

21   not that particular witness is a current drug user we would ask

22   to be able to cross-examine on that point because it goes to

23   his ability to perceive the condition he may be in when he

24   testifies today and through our independent research --

25            THE COURT:  The issue is not whether he's a drug user

D9UFMOR1                         Trial

1    today, it's whether his perception may have been impaired at

2    the time that he saw what he saw.

3           MS. GLAVIN:  And we have reason to believe he was a

4    marijuana user back then.

5           THE COURT:  Was he using marijuana at the time that he

6    perceived what he's going to testify to.

7           MS. GLAVIN:  We don't know, which is why we'd like to

8    be able to cross on it.

9           MS. GARZON:  Your Honor, we've inquired and we were

10   told by the witness that he was not smoking marijuana or using

11   any drugs at that time.

12          THE COURT:  Cross-examination will bring that out.

13   All right.  Anything else?

14          If there is nothing else, then let me check the status

15   of the jury pool.

16          (Pause)

17          THE COURT:  We've been informed that the jury pool the

18   earliest will be here at 10:30, they are now seeing the

19   orientation film, so we will adjourn until about 10:30.

20          (Recess pending jury selection)

21

22

23

24

25

D9udmor2

1          (A jury of 12 and two alternates were selected and

2     sworn)

3          THE COURT:  Thank you.  Be seated.

4          Now, I am going to proceed with some brief preliminary

5     instructions.  After that I will ask the parties whether they

6     have opening statements that they wish to make.  My preliminary

7     remarks should take about 20 minutes or so.  I understand that

8     the parties may present opening statements that will last

9     roughly ten minutes apiece, so that we should be able to

10    complete today's proceeding by around 5 p.m.  And then we will

11    adjourn for the day and resume with the actual beginning of the

12    presentation of the evidence tomorrow morning.

13         Now, these comments are not intended to be a

14    substitute for the detailed instructions on the law and the

15    evidence that I will give you at the conclusion of the case

16    before you retire to your deliberations.  Rather, these remarks

17    are a simple explanation of your duties and responsibilities

18    and the basic principles of law which are likely to be involved

19    in this case.

20         As a preliminary matter, I would like to review with

21    you the trial schedule.  As I have already indicated, we expect

22    that the trial will last approximately one week.  And I say

23    "approximately" because there is part of that schedule that is

24    not in our control.  The parties expect that the presentation

25    of the evidence may conclude sometime by Thursday or so.  If it

D9udmor2

is, then you will receive the case for your consideration.  And

how long you need to conclude your deliberations is a matter

entirely up to you and not something that we will control.  But

at the very least those portions of the trial that are involved

in the presentation of the evidence and instructions should

conclude before the end of the week.

          In this court I start the day at 9 o'clock in the

morning sharp -- not 9:15, not 9:30 but 9 o'clock when we

indicate 9 o'clock -- and we continue until roughly 5 o'clock,

unless for some reason we need additional time.  And as I

indicated earlier, if we do, we will try to give you enough

advance notice so that you can plan accordingly.  It is

extremely important that you will allow sufficient time in the

morning to ensure that you arrive at the designated time,

because the trial cannot start until all of you are present and

delays could result in having to stay later or even prolonging

the trial beyond the one week that we estimate it should take.

          We will take a lurch break every day at approximately

12:45 or 1 o'clock for roughly an hour, unless we are making

good time.  We also will take two ten-minute breaks or so, one

in the morning, one in the afternoon.  If at any time any of

you wants the Court to declare a brief recess for any reason,

just raise your hand and let me know and we will take a

five-minute recess, no questions asked.  We will be glad to

accommodate you in this respect.

D9udmor2

1          Your purpose as jurors is to find the facts and

2     determine factual issues.  The jury is the sole judge of the

3     facts in this case.  Your task is to decide factual issues

4     based on the evidence presented to you, and then to apply the

5     facts as you determine them to the law contained in my

6     instructions at the conclusion of the trial.

7          As I mentioned during the jury selection process, the

8     question of punishment is for the Court alone to determine and

9     must not enter into your deliberations on the guilt or

10     innocence of the defendant.  You may not speculate as to the

11     potential punishment or sentence that the defendant you are

12     considering may face in connection with any of the charges or

13     the charge brought against him by the government.  Nor may you

14     consider the question of punishment when you apply the facts to

15     the law during your deliberations.

16          While you are the sole judge of the facts, the Court

17     alone is the sole judge of the law.  In other words, it is my

18     role to preside at the trial, to rule on the various legal

19     issues as they come up during the trial, and instruct you on

20     the legal principles that you are to apply to the facts as you

21     find them.  The law as given to you by the Court constitutes

22     the only law for your guidance.  It is your duty to follow the

23     law as I give it to you.

24          You are to determine the facts in this case solely

25     from the evidence, which consists of, one, the sworn testimony

D9udmor2

of witnesses, regardless of which body may have called the

witness; two, any video recordings, audio recordings,

documents, physical things that may have been received in

evidence, regardless of who produced the materials, and all

facts which may be judicially noticed, if any, as well as all

facts to which the parties have stipulated and which I instruct

you to take as true for the purposes of this case.

Evidence is a very specific and limited concept.  Not

everything that you see and hear in the courtroom is evidence.

For instance, what I say now or later is not evidence.  Also,

what the lawyers say in their opening statements and/or closing

arguments is not evidence.

To put it affirmatively, evidence consists of the

answers given by the witnesses from the witness stand under

oath.  It is the answer that is the evidence and not the

question or how the question is asked.  Obviously, to evaluate

the answer you have to consider the question to which it was in

response.  As I mentioned, statements and arguments by counsel

are not evidence in the case unless made as an admission or a

stipulation, which means that the attorneys agreed to a certain

fact.  If the attorneys on both sides stipulate or agree to the

existence of a fact, I will instruct you that you must accept

the stipulation as evidence and regard the facts as proven.

On occasion I may tell you that I am taking judicial

notice of certain facts or events.  If I do, you may but you

D9udmor2

1  are not required to accept as conclusive any facts that the

2  court may judicially notice.

3         You are to consider only the evidence in the case, but

4  in your consideration of the evidence you are not limited only

5  to the statements of the witnesses; in other words, you are not

6  limited solely to what you see and hear the witnesses testify.

7  You are permitted to draw from the facts which you find to have

8  been proved such reasonable inferences as you feel are

9  justified in light of your experience.

10         The decision on the facts of the case should not be

11  determined by the number of witnesses testifying for or against

12  a party.  You should consider all of the facts and

13  circumstances in evidence to determine which witnesses you

14  choose to believe or not believe.  You may find that the

15  testimony of a smaller number of witnesses on one side is more

16  credible than the testimony of a greater number of witnesses on

17  the other side.

18         Finally, keep in mind that you must not consider

19  anything that you may have read or heard about the case outside

20  of the courtroom as evidence whether before or during the

21  trial.

22         I would like to mention a few more principles about

23  evidence which I think will help you as we proceed.

24         Some evidence is admitted for a limited purpose.  If I

25  instruct you that an item of evidence has been admitted for a

D9udmor2

1    limited purpose, you must consider it only for that limited

2    purpose and for no other purpose.

3            Some of you may have heard the terms "direct" and

4    "circumstantial" evidence.  Direct evidence is simply evidence,

5    like the testimony of an eyewitness, which, if you believe it,

6    directly proves a fact.  If the witness testified that he or

7    she saw it raining outside and you believed that witness, that

8    would be direct evidence that it was raining.

9            Circumstantial evidence simply is a chain of

10   circumstances that indirectly proves a fact.  If someone walked

11   into the courtroom wearing a raincoat covered with water and

12   carrying a wet umbrella, that would be circumstantial evidence

13   from which you could conclude that it was raining outside.

14           It is your job to decide how much weight to give the

15   direct evidence and circumstantial evidence.  The law makes no

16   distinction between the weight that you should give to either

17   one and does not say that one is any better evidence than the

18   other.  You should consider all of the evidence, both direct

19   and circumstantial, and give the evidence whatever weight you

20   believe it deserves.

21           Part of your job as jurors, while determining the

22   facts, is to decide how credible or believable each witness is.

23   This is your job, not mine.  It is up to you to decide if a

24   witness' testimony is believable and how much weight you think

25   it deserves.  You are free to believe everything that a witness

D9udmor2

says, or only part of it, or none of it at all, but you should

act reasonably and carefully in making your decisions.

Let me suggest some things that you may consider in

evaluating the testimony of each witness.

Ask yourselves if the witness is able to see or hear

the events in a clear manner.  Sometimes even an honest witness

may not have been able to see or hear what was happening and

may make a mistake.  Ask yourselves how good the witness'

memory seems to be.  Does the witness seem able to remember

accurately what happened?  Ask yourself if there is anything

else that may have interfered with the witness' ability to

perceive or remember events?

Ask yourselves about how the witness acts while

testifying.  Does the witness appear honest, or does the

witness appear to be evasive?  Ask yourself if a witness has

any relationship to the government or the defendant, or

anything to gain or lose from the case that might influence the

witness' testimony.  Ask yourself if the witness has any bias

or prejudice or reason for testifying that might cause the

witness to slant testimony in favor of one side or the other.

Ask yourselves whether the witness testified

inconsistently while on the witness stand or if the witness

said or did something at any other time that is inconsistent

with what the witness said while testifying.  If you believe

that the witness is inconsistent, ask yourself if this makes

D9udmor2

the witness' testimony less believable.  Sometimes it may;
other times it may not.  Consider whether the inconsistency is
about something important or about some unimportant detail.
Ask yourselves if it seems like an innocent mistake or if it
seems deliberate.

     And ask yourselves how believable the witness'
testimony is in light of all of the evidence in the case.  Is
the witness' testimony supported or contradicted by other
evidence that you find believable?  If you believe that a
witness' testimony is contradicted by other evidence, remember
that people sometimes forget things, and even two honest people
who witness the same event may not describe it exactly the same
way.

     These are only some of the things that you may
consider in deciding how believable each witness is.  You may
also consider other things that you think shed some light on
the witness' credibility.  Use your own common sense and
everyday experience in dealing with other people and then
decide what testimony you believe and how much weight you think
it deserves.

     No statement or rule or remark or comment that I may
make during the course of the trial is intended to indicate my
opinion as to how should decide the case or to influence you in
any way in determining the facts.

     At times, I may ask questions of a witness.  If I do,

D9udmor2

it may be to clarify a matter and should not be viewed in any

way by you to indicate my opinion about the facts or to

indicate the weight I feel you should give to the testimony of

the witness.

Remember that you, as jurors, are at liberty to

disregard all comments of the Court in arriving at your

determination of the finding of fact.

Also, I may at times take notes.  Keep in mind that

whether or not I am taking notes at a particular time should

not affect you or lead you to think that any one piece of

information is more noteworthy than any other.

During the trial it may be necessary for me to confer

with the parties from time to time out of your hearing

concerning questions of law or procedure that require

consideration by the Court alone.  On some occasions you may be

excused from the courtroom as a convenience to you and to us

while I discuss these matters with the lawyers.  These

occasions will be kept to a minimum.

I will meet with the lawyers in the mornings before we

get started with you and in the afternoons after you are sent

home for the day in order to avoid, to the extent possible,

interruptions when you are here, but you should remember at all

times the importance of the matter that you are here to

determine and, please, remember to remain patient.

(Continued on next page)

1           THE COURT:  The parties may sometimes present

2     objections to some of the testimony or other evidence.  You

3     should not be prejudiced in any way against a lawyer or party

4     who makes an objection.  At times I may sustain objections and

5     you may hear no answer to a question or, where an answer has

6     already been made I may instruct you that the answer is to be

7     stricken or removed from the record and I may direct you to

8     disregard certain testimony or evidence.  You must not consider

9     any testimony to which an objection has been sustained or any

10    evidence which I have instructed you to disregard.

11          The law requires that your decision be made solely

12    upon the evidence before you.  The testimony or evidence that I

13    exclude from your consideration will be excluded because it is

14    not legally admissible.  In reaching a decision you must not

15    draw any inference or conclusion from any unanswered question

16    and you must not consider any testimony which has been stricken

17    from the record.

18          I remind you if I sustain an objection it means I

19    found the objection to be legally correct and the information

20    to which it pertains should not be considered by you.  If I

21    overrule an objection it means I have found the objection to be

22    incorrect as a matter of law so the information to which the

23    information pertains may be considered by you as you consider

24    the facts.

25          As you know this is a criminal case.  There are three

D9UFMOR3                         Trial

1   basic rules about criminal cases that you should keep in mind.

2   First, the defendant is presumed innocent until proven guilty.

3   The indictment against the defendant brought by the government

4   is only an accusation, nothing more.  It is not proof of guilt

5   or anything else.  The defendant therefore starts out with a

6   clean slate.  Second, the burden of proof is always on the

7   government throughout the trial.  The defendant has no burden

8   to prove his innocence or to present any evidence or to

9   testify.  Since the defendant has a right to remain silent the

10  law prohibits you from arriving at your verdict by considering

11  that the defendant may not have testified.  Third, the

12  government must prove the defendant's guilt with respect to the

13  count in the indictment beyond a reasonable doubt.  I will give

14  you further instructions on this point later but bear in mind

15  in this respect a criminal case is different from a civil case.

16          As I mentioned, by the end of the trial I will give

17  you detailed instructions on the law and those instructions

18  will control your deliberations and decision but in order to

19  help you follow the evidence I will give you a brief summary of

20  the elements that the government must prove beyond a reasonable

21  doubt to make this case with respect to the charge.

22          After you've heard and seen all the evidence in the

23  case I will ask you to deliberate carefully according to my

24  instructions and ultimately render a decision regarding the

25  defendant's guilt or innocence for the count in the indictment

D9UFMOR3                          Trial

1  with which he's been charged.  To summarize, I will summarize

2  the indictment.  Later on you will have a copy of the actual

3  indictment so don't worry about remembering everything I tell

4  you now.

5          Count One charges Johnny Morgan with being a felon in

6  possession of a firearm.  Again, it is the government's burden

7  to prove every element of the offense I have just described

8  beyond a reasonable doubt.  I will give you more specific

9  descriptions and instructions related to the elements of the

10  offense after you have seen and heard all the evidence in the

11  case and begun your deliberations.

12          A few words on your conduct as jurors.  I have just

13  explained your role is to consider all the evidence before you

14  and properly decide the facts.  You must endeavor not to decide

15  any issue or form any opinion in the case until you have heard

16  all of the evidence, been instructed on the law by me and

17  retired to the jury room to deliberate.  When the case is

18  submitted to you, which means at the end of the trial, you are

19  not to discuss the case with anyone, not even your fellow

20  jurors.  Likewise, it would be improper for you to allow anyone

21  to discuss the case in your presence.  In addition, you must

22  not talk to the parties or witnesses under any circumstances.

23  Sometimes jurors have difficulty understanding why it is that

24  they're not allowed to discuss the case with you.  We ask you

25  not to discuss the case because we want you to keep an open

1    mind until you've heard all the evidence and my instructions

2    regarding the law.  Therefore, we ask you to avoid discussing

3    the case with anyone until your deliberations begin.  It's

4    important that you strictly observe the rules, so that the

5    rules will apply during a recess or a break at the trial to

6    assure that the parties have a fair trial that they're entitled

7    to by not allowing any outside influences, information or

8    inferences to sway your consideration of the case.

9             I repeat, as I just mentioned, do not discuss the case

10   among yourselves or with anyone else on the outside.  Do not

11   permit anyone to discuss the case with you in your presence.  I

12   realize this may be difficult because it may include family

13   members, spouses, friends and good friends.  But it is the only

14   way that the parties can be assured of the absolute

15   impartiality they're entitled to expect from you as jurors.

16   Until you retire from the jury room at the end of the case do

17   not talk about the case.  Secondly, attorneys and parties in

18   this case, as in any case, are instructed not to have any

19   contact or to communicate with you in any way.  If you should

20   happen to see or to hear any of the attorneys or the assistants

21   or anyone else involved in the case in the halls, in the

22   elevators or anywhere in the trial and they do not greet you or

23   somehow ignore you or your exchanges or look very awkward,

24   please do not think they're being rude.  They're only following

25   the instructions of the Court given in any case.

1          Third, it is important that you not read any newspaper

2    articles or listen to the radio or television broadcast about

3    the case, if any.  Media accounts may be inaccurate and may

4    contain information which is not proper evidence for you to

5    consider.  If there are any media reports about the case, avoid

6    reading or watching them.

7          Fourth, do not try to do any research or any

8    investigation in the case of your own.  This includes any form

9    of electronic means, internet, Facebook or social media of any

10   kind, telephones.  It is important that you avoid any such

11   information in any of those media.  If anyone should try to

12   talk to you about the case you must bring that to my attention

13   immediately, but not discuss it with your fellow jurors.

14   Likewise, should you inadvertently come upon any information,

15   read see or hear anything concerning the case you should inform

16   me immediately.

17         Finally, do not attempt to form any opinion until

18   after all the evidence is in.  In fairness to the parties you

19   should keep an open mind throughout the trial and reach a

20   conclusion only during your deliberation after all of the

21   evidence is in and you have heard the attorneys' closing

22   argument, my instruction on the law and then only after an

23   interchange of views with your fellow members of the jury.

24   Thereby each of the parties will receive equal and fair

25   consideration from you.

D9UFMOR3                        Trial

1              If you want to take notes during the trial you may do

2       so.  However, it is difficult to take notes and pay attention

3       to what the witnesses are saying at the same time.  If you do

4       take notes, be sure that your note taking does not interfere

5       with your listening and consideration of all of the evidence.

6       Also if you take notes do not discuss your notes with anyone

7       before you begin your deliberations.  Keep in mind that you

8       will not be allowed to take your notes with you at the break

9       time or at the end of the day or at the end of the trial.  We

10      will give you note pads to facilitate you taking notes but

11      these should be left on your chairs during the breaks and lunch

12      and at the end of the day.  Whether or not you choose to take

13      notes remember it is your own individual responsibility to

14      listen carefully to the evidence.  You cannot give this

15      responsibility to somebody else who is taking notes.  Notes

16      should be used only to refresh the recollection of the juror

17      who took the notes.  You should not use notes in the jury

18      deliberations to prove to other jurors that your notes are in

19      fact what a witness said.  Your notes reflect only your

20      impression of what the witness said.  We depend upon all our

21      judgments, the judgments of all members of a jury, and you are

22      all responsible for remembering the evidence in the case.

23      Remember that notes are only aids to memory and should not be

24      given precedence over your own independent recollection of the

25      facts.

1          You will notice that we do have an official court

2     reporter making a record of the trial.  Although you will not

3     have a typewritten transcript of the trial made available to

4     you for your use when reaching a decision in the case if you

5     have questions about any portion or excerpt of the testimony it

6     may be possible to have the excerpt read back to you.  That

7     said, if and when that happens it is very important for you to

8     be as precise as possible about the testimony that you wish

9     read back to you.

10          Finally, let me give you a summary of the order of

11     proceedings.  The trial will proceed as follows:  The

12     government will make an opening statement which is simply an

13     outline to give you a frame of reference and help you

14     understand the evidence as it comes in.  Next, the defendant's

15     attorney may but does not have to make an opening statement.

16     What is said in these opening statements is not evidence.  The

17     government will then present its witnesses and counsel for

18     defendant may cross-examine them.  Following the government's

19     case the defendant may if he wishes present witnesses whom the

20     government may cross-examine.  After all of the evidence is in

21     the attorneys will present their closing arguments to summarize

22     and interpret the evidence for you and what the parties feel

23     the evidence has proved or not proved and what inference they

24     believe you may draw from the evidence.

25          What the parties say in these closing arguments is not

 1   evidence, just as what they said in these opening statements is

 2   not evidence.  Closing arguments are designed to present to you

 3   only their view of what the evidence has shown.

 4          After you heard the closing arguments I will instruct

 5   you on the applicable law and then you will retire to

 6   deliberate on your verdict.  Keep in mind that during your

 7   deliberations you will be permitted to see the exhibits that

 8   have been admitted into evidence during the trial and to have

 9   witness testimony read back to you if you so request.

10          With that, I will then call upon the parties to

11   present their opening statements, government and defense.  If

12   you wish to take notes, the clerk will distribute note pads and

13   pens to aid any of you who wish to do so.

14          Government?

15          MS. GARZON:  Thank you, your Honor.  May I proceed?

16          THE COURT:  Yes.

17          MS. GARZON:  In the early morning hours of

18   February 20, 2012, that man, Johnny Morgan, walked into a

19   nightclub, pulled out a gun and pointed it at another man.  The

20   other man, with the gun pointed at him, pleaded with the

21   defendant to leave.  The defendant left, but just a few minutes

22   later he fired off four shots less than a block away from the

23   club.

24          That night when the defendant possessed that gun he

25   committed a federal crime because the defendant is a convicted

D9UFMOR3                    Opening - Ms. Garzon

1   felon and federal law prohibits felons such as the defendant

2   from possessing guns.  And that, ladies and gentlemen, is why

3   we're here today.

4         Now, let me tell you a little bit more about what

5   happened during the early morning hours of February 20.  The

6   evidence will show that about 4:00 a.m. the defendant was in a

7   club in the Bronx.  When it was time to close the defendant did

8   not leave as most other patrons did.  Instead, a security guard

9   had to ask him to leave.  But the defendant did not listen and

10  he did not leave.  When he refused to leave security threw him

11  out and the defendant was mad that he was thrown out of the

12  club.  So a few minutes later he came back.  But this time he

13  came back with a gun.  Again, security asked him to leave.

14  Again the defendant did not listen.  Instead, the defendant

15  pulled out a gun and pointed it at another man.  That man

16  turned out to be the owner of the club.

17        When the defendant pulled out the gun others in the

18  club scattered, some running for cover, some running out the

19  back door.  The owner, with the gun pointed at him, again

20  pleaded with the defendant to leave.  He tried to calm the

21  defendant down and eventually he convinced the defendant to

22  leave the club.  But the defendant was not done.  When he got

23  outside he fired four shots and you will hear from a witness

24  who will tell you, who lived across the street, that he called

25  911 when he heard those four shots.  You will also hear that in

1    a few minutes after the defendant fired off the four shots the

2    NYPD responded to a call reporting a man with a gun.  The man

3    with the gun was a few blocks from the club and close to where

4    the shots had been fired.  When the officers responded they saw

5    the defendant.  There was no one else around.  The defendant

6    was walking towards a corner on a deserted street at dawn.  The

7    officers called out to the defendant.  They identified

8    themselves as police.  They told him to stop but the defendant

9    did not listen and he did not stop.

10            Walking fast, the defendant tossed the gun.  You will

11   hear from an officer who will tell you that he saw the

12   defendant's motion, motion his arm as if tossing a gun and that

13   he heard a loud clang as an object hit the ground.  In that

14   very area where the defendant made that motion NYPD officers

15   found a semiautomatic gun.

16            The NYPD also searched the area where the gun had been

17   fired and in that area they found four spent shell casings, and

18   that's simply the covering that comes off of a bullet when a

19   bullet is fired.  Those four shell casings match the very gun

20   that was recovered where the defendant made the hand motion.

21   The defendant was placed under arrest.  That's what the

22   evidence that this trial will show.

23            Now, let me tell you how we'll show that.  How are we

24   going to prove to you, the jury, that the defendant possessed

25   the gun at dawn on that February day.  First, you're going to

1    see the physical evidence in this case.  You're going to see

2    the evidence that was recovered when the defendant was

3    arrested.  You're also going to see the shell casings that were

4    fired and recovered less than a block away from the club where

5    the defendant pulled that gun.  Second, you're going to see

6    maps and pictures, including pictures of the defendant in the

7    club that night.

8            Third, you're going to hear from multiple witnesses,

9    including the 911 caller who called to report the shots fired.

10   You're going to hear from the officers who saw the defendant

11   make the motion as if throwing the gun from officers who placed

12   the defendant under arrest and from officers who recovered the

13   shell casings less than a block away from the club.

14           You're also going to hear from a detective in the

15   firearms analysis section of the NYPD.  He will talk to you

16   about the ballistics, that is, the shell casings that were

17   recovered in this case.  And he will tell you that those shell

18   casings match the gun that was recovered when the defendant was

19   arrested.

20           You're also going to hear from people who were in the

21   club that night.  You're going to hear from the security guard

22   who kicked the defendant out.  You're also going to hear from

23   the owner who had the gun pointed directly at him.  Together

24   this evidence will show that the defendant possessed the gun in

25   the early morning hours of February 20, 2012.

1          Ladies and gentlemen, this will not be a lengthy trial

2     but it is an important case.  It's important for the defendant

3     for the obvious reason that he stands accused of violating

4     federal law and it's important for the government because the

5     government is tasked with enforcing the federal gun laws.

6          Now, we'll have another chance to address to you at

7     the end of the trial when all the evidence is in, but between

8     now and then I'd like to ask you to do three things.  First,

9     pay close attention to the evidence as it comes in.  Second,

10    follow Judge Marrero's instructions on the law carefully, and,

11    third, use your common sense when you're evaluating the

12    evidence.  That's the same common sense that you use in your

13    everyday lives as New Yorkers.  If you do those three things

14    then I am confident at the end of the trial when all of the

15    evidence is in and you, the jury, get the final word you will

16    reach the only conclusion that is consistent with the evidence

17    and the law, and that is, that Johnny Morgan is guilty beyond a

18    reasonable doubt.

19          THE COURT:  Ms. Glavin.

20          MS. GLAVIN:  The most important piece of evidence that

21    you're going to see in this case Ms. Garzon didn't mention to

22    you.  You're going to learn that there was a surveillance video

23    outside that club that night -- the club is called the Pompeii

24    Lounge -- and that surveillance video was obtained by the NYPD,

25    and that surveillance video shows a good part of this incident

D9UFMOR3                    Opening - Ms. Glavin

1     that the government alleges my client was involved in.  The

2     surveillance video shows my client interacting with the owner

3     of the club and about three or four other guys.  And when you

4     see that surveillance video you're going to see he didn't have

5     a gun, he wasn't the aggressor and he wasn't a man that left

6     the club in anger, went out and grabbed a gun, walked into the

7     club, up to the owner, cocked it and pointed it at him.  You're

8     going to see on that surveillance video, and I am praying to

9     you to look at that video over and over again because the NYPD

10    obtained the video from the pharmacy next door to this club and

11    you're going to see this play out.  Mr. Morgan didn't have a

12    gun that night.  That's why we're here and that's what this

13    case is about.

14          Now, when you came in here this morning and I know

15    it's been a long process, but when you came in here you were

16    probably thinking to yourselves, you hear about the case, he

17    probably did it.  He got charged, why are we here, what's he

18    doing over there, that Mr. Morgan.  And, frankly, after I heard

19    Ms. Garzon's opening, which was a very good opening, I'd be

20    thinking why are we going to trial; what is there to argue

21    about, open and shut, why are Ms. Glavin and Mr. Morgan wasting

22    my time.

23          Well, you can't make up your minds and you especially

24    can't make up your minds because of what the prosecution didn't

25    mention in its case, and ask yourselves over and over again

1     when you see the surveillance video is that in any way

2     consistent with what you're going to hear from the club owner

3     and the security, his security guys that were working there

4     that night.

5           Now, let's talk a little bit about what the evidence

6     is going to be in the case.  You're going to hear a little bit

7     about this place, it's called the Pompeii Lounge.  It's on East

8     Tremont Avenue and it's in the Bronx.  What you're going to

9     hear about is that the Pompeii Lounge is fairly notorious, and

10    the owners of the lounge had a lot of trouble themselves, had a

11    lot of problems with the 45 Precinct, that was the precinct

12    that made the arrest in this case.  And what's going to be very

13    important for you is to listen to what Mr. Torres tells you

14    about the club and what his bouncers tell you about the club.

15    Pay attention, hear what they say about all the security in the

16    club, frisking people when they came in, about surveillance

17    cameras that they had in the club.  Pay a lot of attention to

18    the witnesses that take the stand and the witnesses that don't.

19          Ladies and gentlemen, this case is going to be a case

20    that in your gut is going to bother you throughout.  I promise

21    you that.  And you're going to keep wondering is there more.

22    Mr. Morgan was not found with a gun on him.  And I want you to

23    listen carefully to the testimony of the police officers who

24    stopped him.  Again, listen to who testifies and who does not.

25    Remember that the defense has no burden here.

1          What I want you to do, not only paying attention to

2     the surveillance video that the NYPD obtained because if you

3     look at that video you're going to say to yourselves if that's

4     Johnny Morgan on that video and he had a gun and he's angry and

5     it's 4:00 in the morning, why are there four or five guys

6     hitting him with a water bottle.  You actually see them pat him

7     down.  If he had a gun, he was angry, you'd see in that video

8     he pulls it out.  He didn't have a gun.

9          This case is going to raise a lot of questions for you

10    and it certainly isn't going to come in exactly the way the

11    government tells you, and that's why it's going to be very,

12    very important for you to listen to cross-examination.  Because

13    what sometimes happens during trial is that the government will

14    have a witness on the stand and you'll be thinking, oh, wow,

15    that makes sense, that person did it.  And then all of a sudden

16    you'll hear on cross-examination, you're like, huh, I didn't

17    know that.  Pay a lot of attention to what Mr. Torres, who is

18    the owner of the club and his guys, the security guards, what

19    they say now and what they said in the past about who was there

20    that night and who did what and who didn't do what.

21          Because at the end of the trial I'm going to ask you,

22    keep thinking to yourself about the government's case, because

23    the government asked you to use your common sense.  I'm going

24    to ask you to do something else.  I want you to think to

25    yourselves is this evidence complete, is it reliable and is it

D9UFMOR3                         Opening - Ms. Glavin

1    compelling.  Because when I get the chance to stand up here at

2    the end of the trial and Mr. Morgan is going to need you

3    probably more than he's ever needed anybody in his life, I'm

4    going to ask you to find him not guilty.

5          Thank you so much for serving as jurors.  Thank you so

6    much ahead of time for using your common sense and thank you

7    for doing what's going to be a very, very important job that's

8    very important to the defense in this case.  Thank you.

9          THE COURT:  All right, it's shortly before five, so

10   I'm going to adjourn the proceedings for the evening and ask

11   that you return tomorrow at 9:00.  You'll recall what I said

12   several times during the course of the day, 9:00 in this

13   courtroom means 9:00.  To the extent that you're not here on

14   time and we are delayed I will be compelled to try to make up

15   any lost time by shortening up on the lunch hour or the breaks

16   or going extra time at the end of the day.  Because until we

17   have a sense of how we're doing on the time that I've estimated

18   I must maintain the daily schedule that I set out starting and

19   finishing.  So any lateness on the part of the jury is only

20   going to inconvenience your members as well as the parties in

21   the case.

22          As you go today to your homes do not discuss the case

23   among yourselves or with anyone on the outside or have any

24   contact of any kind with anyone or read any accounts of the

25   case or do any research, the same instruction that I gave

1    during the preliminary instructions and I will give it to you

2    more than once every day, and that should underscore the

3    importance of that instruction.  So have a good evening and we

4    will see you tomorrow.  When you come in go directly into the

5    jury room where the clerk will now escort you and wait there

6    until you're called into the courtroom.

7                (Jury excused)

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court; jury not present)

 2              THE COURT:  Thank you.  Be seated.  Will the

 3    government give us a summary of the witness list that it has

 4    for tomorrow and if possible for the next day and the order in

 5    which you expect the evidence to come in?

 6              MS. GARZON:  Yes, your Honor.  The government expects

 7    that tomorrow it will call several lay witnesses to start.

 8    First, beginning with Mr. Robert Portela; second, Mr. Jose

 9    Torres; third, Mr. Jamil Toogood; fourth, Mr. Benny Tirado;

10    fifth, possibly custodial witness to introduce the 911 call

11    that we discussed earlier today.  Sixth, NYPD Officer Josue

12    Sepulveda; seven, NYPD Officer Alan D'Alessio and NYPD Officer

13    Chris Lopez, NYPD Officer Christopher Gravius, NYPD Sergeant

14    Morgan Courgnaud and Detective Salvatore Lacova who we will be

15    presenting as an expert on the ballistics analysis in this

16    case.

17              THE COURT:  That's all of the witnesses.

18              MS. GARZON:  That is, your Honor.

19              THE COURT:  How many do you expect to get through --

20    first, let me get an estimate how long you have on those for

21    tomorrow.  Mr. Portela?

22              MS. GARZON:  Direct examination, your Honor, fifteen

23    minutes.

24              THE COURT:  All right.  Mr. Torres?

25              MS. GARZON:  Probably about 20 to 30 minutes.

D9UFMOR3                    Trial

1           THE COURT:  Mr. Toogood?

2           MS. GARZON:  Ten to fifteen.

3           THE COURT:  Mr. Tirado?

4           MS. GARZON:  Less than ten minutes.

5           THE COURT:  Custodial witness?

6           MS. GARZON:  Less than ten minutes.

7           THE COURT:  So far that's about one hour.  We're in

8  the middle of the morning.  Police Officer Sepulveda?

9           MS. GARZON:  Your Honor, I'm not accounting for

10  cross-examination in my estimates.

11          THE COURT:  Understood.

12          MS. GARZON:  Officer Sepulveda about 20 to 30 minutes.

13          THE COURT:  Mr. D'Alessio?

14          MS. GARZON:  Maybe 30 to 40 minutes.

15          THE COURT:  Lopez?

16          MS. GARZON:  Less than ten minutes.

17          THE COURT:  Gravius?

18          MS. GARZON:  Gravius and Courgnaud less than ten

19  minutes.

20          THE COURT:  Then Lacova?

21          MS. GARZON:  Lacova will be approximately 30 minutes.

22  Maybe a little bit more.

23          THE COURT:  All right, well, depending upon

24  cross-examination by my estimate there's no reason why all of

25  these should not be concluded by Wednesday.

1           MS. GARZON:  That is what the government anticipates,

2       your Honor.

3           THE COURT:  All right.  And especially that begin

4       early in the morning and go straight.  So we generally squeeze

5       in somewhere between about six hours of testimony time during

6       the course of the day.

7           All right, anything from defense?

8           MS. GLAVIN:  Yes, your Honor.  With respect to -- I've

9       had discussions with the government about NYPD officers and

10      their availability and it would appear from the government's

11      witness list that they do not intend to introduce the

12      surveillance video that was obtained from outside the

13      nightclub, in which case we would be introducing it in the

14      defense case.  So we would ask that the government make

15      Detective Connor available, Detective Efreirej available and we

16      would ask for the name of the individual at the Tremont

17      Pharmacy from whom the NYPD obtained the surveillance video for

18      the early morning hours of February 20th.  Unless, of course,

19      the government wants to stipulate to the admissibility of the

20      video.

21          THE COURT:  Ms. Garzon?

22          MS. GARZON:  Your Honor, I think the government is

23      fine to stipulating the admissibility of the video and we had

24      asked the defense whether they would be interested in

25      stipulating to the admissibility of the video, so we would

1   intend to offer it in our case in chief if we did stipulate to

2   it.

3              As far as the officer is concerned, we have notified

4   them that they are to be available for the defense in this case

5   and the government can provide the name of the pharmacy owner

6   to defense counsel.

7              THE COURT:  All right.  All right, thank you.  If

8   there's nothing else, then have a good evening.  Ms. Glavin?

9              MS. GLAVIN:  Your Honor, with respect to in the order

10  of the witnesses, with respect to the playing of the 911 call

11  that would be the call by Mr. Santa that was the subject of

12  some pretrial discussions this morning, we would like to have

13  Mr. Santa available to do the cross after the playing of that

14  911 call, in other words, to impeach him as though he testified

15  and cross-examined as opposed to having to call him at the very

16  end of the case and put him on the case in chief.

17             THE COURT:  Ms. Garzon?

18             MS. GARZON:  Your Honor, as I stated previously,

19  Mr. Santa has been served with a subpoena in this case.  We

20  would love to have him here.  We just don't know if he's going

21  to come.  That's what he's expressed to us in our

22  conversations.  He's very reluctant to come.  He is concerned

23  about his safety and his family's safety.  So that's where we

24  stand with Mr. Santa.

25             MS. GLAVIN:  Your Honor, if Mr. Santa does not appear

D9UFMOR3                    Trial

1    and we are not able to avail ourselves of Rule 806 we would

2    move to strike the playing of the 911 call.

3              MS. GARZON:  Your Honor, I would just note that

4    Ms. Glavin has as much power to subpoena Mr. Santa as we do.

5    As far as I know, I don't believe the defense has subpoenaed

6    Mr. Santa.  But the defense is certainly free to do that to try

7    to get him here.

8              MS. GLAVIN:  Just note for the record he's under

9    federal subpoena to appear and it is a crime if he does not

10   appear.

11             THE COURT:  Ms. Garzon, have you made clear to

12   Mr. Santa that there are potential penalties associated with

13   refusing to appear in response to a subpoena?

14             MS. GARZON:  Yes, your Honor.  On multiple occasions

15   we have.

16             THE COURT:  All right, Ms. Glavin, I think that on a

17   tactical basis it would be best if you would issue your own

18   subpoena as well.

19             MS. GLAVIN:  Yes, your Honor.  We will do that.

20             THE COURT:  So you don't be in a situation where you

21   say the government didn't try hard enough.

22             MS. GLAVIN:  We will, your Honor, and if the

23   government could cooperate with us in terms of giving us his

24   address and contact information.

25             MS. GARZON:  I just know that the defense already has

D9UFMOR3                    Trial

1    that address.

2              I'd like to make one further comment, your Honor, with

3    respect to Officers Connor and Efreirej so the government could

4    be clear with them about what their expectations are, I guess,

5    I don't know when they should be told to be here.

6              MS. GLAVIN:  I think we can work that out.

7              THE COURT:  We'll get a better sense of that by the

8    end of business tomorrow.  All right.  Thank you, have a good

9    evening.

10             (Adjourned to October 1, 2013 at 9:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25